IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DAWNLYN LITZ, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 05-906 |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Pending before the Court are cross-motions for summary judgment filed by Plaintiff Dawnlyn Litz and Defendant Jo Anne B. Barnhart, Commissioner of Social Security. Plaintiff seeks review of final decisions by the Commissioner denying her claims for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and supplemental security income benefits ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381 *et seq.*[1]    Plaintiff's motion is denied,

---

[1] A person is eligible for supplemental security income benefits if he is "disabled" (as that term is defined elsewhere in the regulations) and his income and financial resources are below a certain level.  42 U.S.C. § 1382(a).  To be granted a period of disability and receive disability insurance benefits, a claimant must show that he contributed to the insurance program, is under retirement age, and became disabled prior to the date on which he was last insured.  42 U.S.C. § 423(a).

Defendant's motion is denied, and the matter is remanded for further proceedings in light of the Opinion which follows.

## II.  BACKGROUND

### A.  Factual Background

Dawnlyn Litz is a college graduate with a degree in elementary education, although she never worked full-time as a teacher. (Certified Copy of Transcript of Proceedings before the Social Security Administration, Docket No. 7, "Tr.," at 43-44.) Ms. Litz claimed that as of May 21, 2002, she became unable to work due to depression, head and back aches, polyneuropathy,[2] and anxiety.  (Tr. 418.)

### B.  Procedural Background

On September 6, 2002, Ms. Litz filed applications for supplemental security income benefits and disability insurance benefits (Tr. 787-790; 418-421, respectively.)[3]  Her applications

---

[2]  Polyneuropathy is defined as neuropathy (i.e., a functional disturbance or pathological change in the peripheral nervous system) of several peripheral nerves simultaneously; called also multiple or peripheral neuropathy.  *See* www.mercksource.com, DORLANDS ILLUSTRATED MEDICAL DICTIONARY.

[3]  Ms. Litz had previously filed benefit applications in August 2000, claiming disability as of April 15, 1998, which were denied by the SSA and by Judge Bukes on May 20, 2002.  The ALJ's decision was subsequently affirmed by the Appeals Council on August 28, 2002.  (*See* Tr. 72-393.)  Ms. Litz did not appeal that decision which is therefore res judicata with regard to her disability prior to that date inasmuch as both applications were based on the same issues and the prior determination was final as a result of administrative or judicial action.  *See* Tobak v. Apfel, 195 F.3d 183, 186 (3d Cir. 1999), *citing* 20 C.F.R. § 404.957(c)(1).  The decision appealed herein refers only to the question of whether Ms. Litz has been under a disability on or after May 21, 2002.  Id.  *See also* Tr. 15 for the ALJ's discussion of

2

were denied on June 26 and 27, 2003.  (Tr. 791-795; 394-397.)  She
then timely requested a hearing before an Administrative Law Judge
("ALJ") on December 15, 2003.  (Tr. 398; 796.)

On September 1, 2004, a hearing was held before the Honorable
James Bukes at which Plaintiff was represented by counsel.  Judge
Bukes issued his decision on October 14, 2004, again denying SSI
and DIB. (Tr. 72-93.)  The Social Security Appeals Council declined
to review the ALJ's decision on April 26, 2005, finding no error of
law or abuse of discretion and concluding the decision was based on
substantial evidence to support the ALJ's findings.  (Tr. 6-9.)
Therefore, the October 14, 2004, opinion became the final decision
of the Commissioner for purposes of review.  42 U.S.C. § 405(h);
Rutherford v. Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005),
citing Sims v. Apfel, 530 U.S. 103, 107 (2000).  Plaintiff filed
suit in this Court on July 6, 2005, seeking judicial review.

C.    Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C.
§ 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that
an individual may obtain judicial review of any final decision of
the Commissioner by bringing a civil action in the district court
of the United States for the judicial district in which the
plaintiff resides.

---

this point.  Plaintiff does not dispute this conclusion.  (Plf.'s
Brief at 2.)

3

## III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining whether the Commissioner applied the correct legal standards and whether the record, as a whole, contains substantial evidence to support the Commissioner's findings of fact. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999). Findings of fact by the Commissioner are considered conclusive if they are supported by "substantial evidence," a standard which has been described as requiring more than a "mere scintilla" of evidence, that is, equivalent to "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve a conflict, created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake de novo review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), citing Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the

4

decision, even if the record contains evidence which would support a contrary conclusion. <u>Panetis v. Barnhart</u>, No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), <i>citing</i> <u>Simmonds v. Heckler</u>, 807 F.2d 54, 58 (3rd Cir. 1986), and <u>Sykes v. Apfel</u>, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. LEGAL ANALYSIS

### A. The ALJ's Determination

In determining whether a claimant is eligible for supplemental security income or disability insurance benefits, the burden is on the claimant to show that he has a medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[4] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last for not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); <u>Morales v. Apfel</u>, 225 F.3d 310, 315-316 (3d Cir. 2000).

To determine a claimant's rights to either SSI or DIB,[5] the ALJ conducts a formal five-step evaluation:

---

[4] According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . Work may be substantial even if it is done on a part-time basis." "Gainful work activity" is the kind of work activity usually done for pay or profit.

[5] The same test is used to determine disability for purposes of receiving either type of Social Security benefits. <u>Burns v. Barnhart</u>, 312 F.3d 113, 119, n1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both SSI and DIB applications.

(1)     if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

(2)     if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

(3)     if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

(4)     if the claimant retains sufficient residual functional capacity[6] ("RFC") to perform his past relevant work, he is not disabled; and

(5)     if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 416.920(a)(4); see also Morales, 225 F.3d at 316.

In steps one, two, and four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy.[7] Sykes

---

[6]   Briefly stated, residual functional capacity, or RFC, is the most a claimant can do despite his recognized limitations. Social Security Ruling 96-9 defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule." See also 20 C.F.R. § 416.945.

[7]   Step three involves a conclusive presumption based on the listings, therefore, neither party bears the burden of proof at that stage. Sykes, 228 F.3d at 263, n2, citing Bowen v. Yuckert, 482 U.S. 137, 146-147 n5 (1987).

v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

Following the prescribed analysis, Judge Bukes first concluded that Ms. Litz had not engaged in substantial gainful activity since May 20, 2002. (Tr. 15.) Resolving step two in Plaintiff's favor, the ALJ found that she suffered from major depression, anxiety and polyneuropathy, all of which were considered "severe" as defined in the Social Security regulations.[8] (Tr. 17-18.) He also concluded Plaintiff's alleged migraine headaches were not severe inasmuch as there was no evidence of treatment for that condition. Therefore, he would not consider that impairment in his subsequent analysis. (Id. at 18.)

At step three, the ALJ concluded that Plaintiff's conditions, taken alone or in combination, did not satisfy the criteria for any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 18.) At step four, the ALJ concluded that Ms. Litz could not return to her past relevant jobs as a sales clerk, zoning officer,

---

[8] See 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b), stating that an impairment is severe only if it significantly limits the claimant's physical or mental ability to do "basic work activities," i.e., physical "abilities and aptitudes necessary to do most jobs, including, for example, walking, standing, sitting, lifting, pushing, pulling, reaching, carrying or handling," or mental activities such as understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b). A "severe" impairment is in contrast to "a slight abnormality" which has such a minimal effect that it would not be expected to interfere with the claimant's ability to work, regardless of his age, education, or work experience. Yuckert, 482 U.S. at 149-151. The claimant has the burden of showing that the impairment is severe. Id. at 146, n5.

child care worker, teacher's aide or door-to-door saleswoman which
the vocational expert ("VE") at the hearing, Joseph Kuhar,
classified as unskilled and semi-skilled jobs at the sedentary,
light, and heavy levels of exertion.  (Tr. 19; 65.)

In response to the ALJ's hypothetical question, Mr. Kuhar
stated that there were numerous light jobs such as gate guard and
office cleaner which an individual of Ms. Litz's age, education,
and physical/mental limitations could perform in the local or
national economy.  (Tr. 20-21.)   Therefore, based on Plaintiff's
status as a younger individual[9] with a college education, a work
history of unskilled and semi-skilled occupations but no
transferable skills, and the medical evidence of record, the ALJ
determined at step five that Ms. Litz was not disabled and,
consequently, not entitled to benefits.  (Tr. 20.)

B.   Plaintiff's Arguments

Plaintiff offers three arguments in support of her motion
for summary judgment.   First, she argues the ALJ improperly
disregarded the medical opinions of her treating psychiatrists, Dr.
C. Bryan Norton and Dr. Manoj Lekhwani.   (Brief in Support of
Plaintiff's Motion for Summary Judgment, Docket No. 9, "Plf.'s
Brief," at 6-12.)   Second, Ms. Litz contends the ALJ erred by

---

[9]   Plaintiff was 37 years old at the time of the hearing, making
her a "younger" person according to Social Security regulations.   20
C.F.R. §§ 404.1563(c) and 416.963(c).   Plaintiff does not argue that
any special circumstances existed which would affect her ability to
adjust to work as compared to persons under 45.

8

determining that her depressive and anxiety disorders were not of sufficient severity to meet the criteria set out in Listing 12.04 Affective Disorders or 12.06 Anxiety Disorders.  (Id. at 12-16.) Finally, Plaintiff argues that the ALJ improperly disregarded the VE's testimony and relied on an incomplete hypothetical question, i.e., one which did not include the limitations imposed on her ability to work as a result of headaches and/or panic attacks which would cause to her miss work one day each week.  (Id. at 16-17.)

We begin with Plaintiff's second argument because we find the ALJ's analysis at the third step is "beyond meaningful review" and therefore cause for remand.  See Burnett v. Commissioner of SSA, 220 F.3d 112, 119 (3d Cir.  2000).  In that context, we will also address Plaintiff's argument concerning the weight given to the opinions of her treating psychiatrists as compared to those of the non-examining state agency psychologists.

Ms. Litz argues that the ALJ erred by failing to make specific findings as to which Listing(s) she met or did not meet.  She contends that he could have arrived at the conclusion that she did not meet any Listing only by ignoring medical evidence from her two treating[10] physicians, Drs. Norton and Lekhwani, particularly their

_____

[10]   Social Security regulations identify three general categories of medical sources - treating, non-treating, and non-examining. 20 C.F.R. § 416.902.  Physicians, psychologists and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who have had an "ongoing treatment relationship" with him are considered treating sources.  A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with him, for example, a consultative examiner

9

opinions that she satisfied the "B criteria" of those Listings. Plaintiff's position is that in the absence of conflicting medical evidence to support the ALJ's conclusion that her mental impairments posed only moderate limitations on her capacity for substantial gainful activity, the record "clearly supports" the conclusion that in fact she meets both Listings 12.04 and 12.06.[11] (Plf.'s Brief at 12-16.)

The Social Security Administration has developed a special technique for reviewing evidence of mental disorder claims. Listings 12.04 Affective Disorders and 12.06 Anxiety Disorders are similar in that each sets out three categories which measure the severity and effects of the claimant's impairment, commonly referred to as the A, B, and C criteria.

To meeting Listing 12.04, disorders "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome," the claimant must satisfy the A criteria plus the B criteria, or, alternatively, satisfy the C criteria. The A criteria require that the claimant show the medically documented

_____

who is not also a treating source. Id. Finally, non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records. Id. We note that there are no opinions from mental health consultative examiners in this matter.

[11] The Court notes that although the ALJ did not discuss the Listing or Listings which relate to her diagnosis of polyneuropathy, Plaintiff makes no argument regarding this omission, apparently conceding that her condition was insufficiently severe to meet such a Listing. Therefore, the Court does not extend its discussion to that issue.

persistence, either continuous or intermittent, of depressive syndrome marked by four of nine specific characteristics;[12] manic syndrome with at least three of eight characteristics;[13] or bipolar syndrome with both manic and depressive characteristics.

To satisfy the B criteria of Listing 12.04, the claimant's depressive, manic, or bipolar syndrome must be of such severity that it results in at least two of the following: marked[14] restriction of activities of daily living ("ADLs"); marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence, or pace; or repeated episodes of decompensation, each of extended duration.[15]

---

[12]   These characteristics include anhedonia (total loss of feeling of pleasure in acts that normally give pleasure); appetite disturbance with change in weight; sleep disturbance; psychomotor agitation or retardation; decreased energy; feelings of guilt or worthlessness; difficulty concentrating or thinking; thoughts of suicide; or hallucinations, delusions, or paranoid thinking.  Listing 12.04A.

[13]   The characteristics of manic syndrome are hyperactivity; pressure of speech; flight of ideas; inflated self-esteem; decreased need for sleep; easy distractability; involvement in activities that have a high probability of painful consequences which are not recognized; or hallucinations, delusions or paranoid thinking. Listing 12.04A.

[14]   "Marked" is defined in the regulations as "more than moderate but less than extreme."  Listing 12.00C.  "A marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." Id.  "Marked" is not defined by limitations on a specific number of different activities in each category but rather the "nature and overall degree of interference with function."  Id.

[15]   "Repeated episodes of decompensation, each of extended duration," is defined as "three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks."  Listing

11

To satisfy the C criteria of Listing 12.04, the claimant must present medical evidence that his affective disorder has lasted at least two years, resulting in "more than a minimal limitation of ability to do basic work activities." The symptoms or signs of the affective disorder must be currently attenuated by medication or psychosocial support. The C criteria also require the claimant to show one of the following: repeated episodes of decompensation, each of extended duration; a residual disease process resulting in such marginal adjustment that even minimal increases in mental demands or change in the environment would be predicted to cause the individual to decompensate; or a current history of one or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such arrangement.

To satisfy Listing 12.06, disorders in which anxiety is either the predominant disturbance or is experienced if the individual attempts to master its symptoms, the claimant must satisfy both the A and B criteria or, alternatively, the A and C criteria. The B criteria are the same as in Listing 12.04 and, again, the claimant must show that the severity of the anxiety disorder is such that he meets any two of the four criteria. The A criteria require the

---

12.00C. If the claimant has "experienced more frequent episodes of shorter duration or less frequent episodes of longer duration, [the Commissioner] will use judgment to determine if the duration and functional effects of the episodes are of equal severity and may be used to substitute for the listed finding." Id.

12

claimant to provide medically documented findings of at least one of the following: generalized persistent anxiety; a persistent irrational fear of a specific object, activity, or situation which results in avoidance behaviors; recurrent severe panic attacks occurring on the average of at least once a week; recurrent obsessions or compulsions which are a source of marked distress; or recurrent and intrusive recollections of a traumatic experience which are a source of marked distress. The C criterion for Listing 12.06 is that the severity of the anxiety disorder is such that the claimant shows a "complete inability to function independently outside the area of one's home."

The threshold problem with the ALJ's analysis of Plaintiff's mental impairments is that at step three of his analysis he simply states that while Plaintiff's "impairments (major depression, anxiety, and polyneuropathy) are 'severe' as that term is defined in the Regulations . . . . they do not meet or medically equal the requirements of any impairment listed in 20 CFR Part 404, Appendix 1 to Subpart P." (Tr. 17-18.) He then goes on to discuss her depressive and anxiety disorders, treatment, clinical findings, and Dr. Lekhwani's assessment from August 2004. (Tr. 18-19.) However, he not only fails to identify the Listing(s) by which he is evaluating the severity of Ms. Litz's depressive disorder and anxiety disorder, he fails - except in the most conclusory fashion - to discuss the B criteria of the relevant Listings and fails to

13

mention the C criteria at all.

It is long been the rule in the Third Circuit that the ALJ must state explicitly the reasons for his disability determination. *See* Cotter v. Harris, 642 F.2d 700, 704-705 (3d Cir. 1981). The Court of Appeals recently revisited its *Cotter* ruling in Burnett v. Commissioner of SSA, 220 F.3d 112 (3d Cir. 2000). There, the claimant alleged that knee and back injuries had rendered her totally unable to work. The ALJ wrote in his analysis of step three that although Burnett established that she suffered from a severe musculosketal impairment, her "impairment failed to equal the level of severity of any disabling condition contained in Appendix 1, Subpart P of the Social Security Regulations No. 4." Burnett, 220 F.3d at 119. The Court agreed with Burnett that the ALJ's conclusory statement was "beyond meaningful review," particularly because the ALJ had also failed to explain or acknowledge medical and testimonial evidence which would tend to support Burnett's claim that she could not perform her past relevant work. Id., *quoting* Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court pointed out that while it is the claimant's burden to present medical evidence to show her impairment matches a Listing or is equal thereto, the regulations put the responsibility on the ALJ to identify the relevant impairment. Burnett, 220 F.3d at 120, n2. On remand, the ALJ was directed to "fully develop the record and explain his findings at

14

step three, including an analysis of whether and why Burnett's back and knee impairments or those impairments combined, are or are not equivalent in severity to one of the listed impairments." Id. at 120.

Following Burnett, the Court has somewhat modified the holding of that case. While it is necessary for the ALJ to be clear about his reasoning at step three, he is not required "to use particular language or adhere to a particular format in conducting his analysis." Jones v. Barnhart, 364 F.3d 501, 505 (3d Cir. 2004); see also Sassone v. Comm'r of Soc. Sec., No. 05-2089, 2006 U.S. App. LEXIS 1533, * 14 (3d Cir. Jan. 20, 2006), stating that there are no "magic words" an ALJ must use in his decision. Thus, the Court of Appeals has found that although the ALJ may not have explicitly set forth the requirements of a listing, such a "formalistic approach" was not required by Cotter or its progeny if the ALJ identified the specific listings he considered and "evaluated the factual record in a manner which closely tracked the elements of the relevant listings." Whitsett ex rel. Whitsett v. Comm'r of Soc. Sec., No. 04-3265, 2005 U.S. App. LEXIS 8714, *5 (3d Cir. May 16, 2005).

The Court of Appeals has further elaborated the distinction between clearly conclusory statements in which remand is necessary and those cases in which the ALJ simply omitted reference to the precise listing he considered. In Sassone, for instance, the Court

15

found that although the ALJ had failed to identify Listing 1.02, major dysfunction of joints due to any cause, in determining that the claimant's osteoarthritis did not meet or equal a Listing, remand was not necessary for two reasons. First, Listing 1.02 was the only one which could possibly have been considered relevant to Sassone's impairments; second, the ALJ had "implicitly addressed in the negative" the requirements of that Listing by identifying activities Sassone could not do or conditions he did not exhibit. The Court held that because it was able to conduct a meaningful review of the step three analysis, it found no error in the ALJ's failure to cite a specific Listing. Sassone, 2006 U.S. App. LEXIS 1533 at *15-*17. See also Sinclair v. Comm'r of Soc. Sec., No. 03-4846, 2004 U.S. App. LEXIS 15416, * 3 (3d Cir. July 26, 2004), declining to remand when there was only one listing relevant to hepatitis and the record was devoid of evidence that Sinclair met the criteria for that listing; Nelson v. Comm'r of Soc. Sec., No. 03-4740, 2004 U.S. App. LEXIS 13266, *3-*4 (3d Cir. June 28, 2004), same with regard to disorders of the spine; Caruso v. Comm'r of Soc. Sec., No. 03-2709, 2004 U.S. App. LEXIS 9823, *6-*7 (3d Cir. May 19, 2004), same with regard to Listing 1.05C, other vertebrogenic disorders; and Maldonado v. Comm'r of Soc. Sec., No. 03-2759, 2004 U.S. App. LEXIS 8969, *6-*7 (3d Cir. May 5, 2004), same with regard to asthma.

Defendant argues that the ALJ herein accepted without dispute

16

Plaintiff's contention that she satisfied the A criteria for Listing 12.04 and 12.06. (Brief in Support of Defendant's Motion for Summary Judgment, Docket No. 11, "Def.'s Brief," at 9.) She further argues, correctly, that a simple diagnosis of an impairment is not sufficient to establish disability; rather, to be awarded benefits at step three, the claimant must show that she meets all the requirements of a given Listing. (Id. at 10, *citing* Sullivan v. Zebley, 493 U.S. 521, 530 (1990) ("An impairment that manifests only some of those criteria, no matter how severely, does not qualify"); *see also* Peterson v. Barnhart, 215 F. Supp.2d 439, 448 (D. Del. 2002).) The Commissioner concludes that because Ms. Litz did not satisfy two of the four B criteria, she cannot claim to have met either Listing. She then proceeds to set out in detail the evidence she believes supports such a conclusion. (Def.'s Brief at 10-15.)

Everything the Commissioner details in her brief may be true but none of her analysis appears in the ALJ's opinion. Although Defendant repeatedly refers in her brief to the B criteria, there is no mention of such in the ALJ's opinion and certainly no systematic analysis of those points. While he noted her mental characteristics as reflected in Dr. Norton's notes for the period May 13, 2002, through August 11, 2003, e.g., affect, orientation, speech and thought processes, and mood, the ALJ never analyzed the effects of depression and anxiety on her activities of living,

17

concentration and pace, or social functioning except for references to the fact that she was "coping effectively and dealing with the demands of being a single parent." (Tr. 17.) He further noted that he considered "all evidence of record, including the rather minimal clinical findings, conservative treatment and claimant's ability to care for her two young children" in concluding that her depression and anxiety imposed "no more than moderate limitations in concentration, social functioning and activities of daily living." (Tr. 19.) But this in itself is a conclusory statement because he does not describe any of those activities or the effects of her disorders on them, even though there are numerous descriptions of such in the questionnaire provided by Ms. Litz prior to the hearing and her testimony at the hearing as well as in the treatment notes provided by Drs. Norton and Lekhwani. (See, e.g., questionnaire completed on October 10, 2002, Tr. 463-472; testimony at 61-62.[16]) Activities of daily living are one of several subjective matters an ALJ must consider in evaluating the

---

[16] Relevant notes from the ADL questionnaire regarding the effects of Plaintiff's mental impairments which are not mentioned by the ALJ include the fact that she experiences conflicts with family and friends which causes her to withdraw and "there may be no contact for prolonged periods of time;" she responds to criticism by getting "very upset;" she has been fired from "most jobs;" changes in daily schedules or living arrangements cause her to become "completely stressed out" because she has a "difficult time coping and accepting changes;" in her past employment experience, the "work would be 'too much' to handle, too stressful" and supervisors "constantly" complained about her work "or lack of." (Tr. 467-468.) In her testimony, she noted that when she has panic attacks, her hands go numb, she "sweats a lot," her heart beats rapidly, and she sometimes falls if her feet go numb. (Tr. 61-62.)

intensity and persistence of a claimant's symptoms and determining the extent to which those symptoms limit his/her capacity for work. 20 C.F.R. §§ 404.1529(c)(3)(i) and 416.929(c)(3)(i). Such a lack of analysis in the ALJ's opinion runs counter to the requirement of this Circuit that "the grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based." Fargnoli v. Halter, 247 F.3d 44, n7 (3d Cir. 2001), quoting SEC v. Chenery Corp., 318 U.S. 80, 87 (1943).

The medical record shows Ms. Litz experienced varying degrees of depression since highschool. (Tr. 190.[17]) She began treating with Dr. Norton at the Irene Stacey Community Health Center ("Community Health") in June 1998. Dr. Norton initially diagnosed Ms. Litz with recurrent, severe major depression without psychotic features. (Tr. 196.) On February 4, 2002, prior to the hearing at which Judge Bukes denied initially denied SSI and DIB, Dr. Norton completed a psychiatric activities assessment and questionnaire (Tr. 672-682), apparently drafted by Plaintiff or her counsel, in which he noted that her responsibility for two children with health problems[18] "exacerbates her depressive symptomatology" and that the

---

[17]  References to medical records from before May 20, 2002, are provided only establish an historical context for Ms. Litz's impairments and treatment.

[18]  At the time of the second hearing, Plaintiff had a six-year old son who had been diagnosed with cerebral palsy and attention deficit hyperactivity disorder. Her daughter, who was three years old at the time, had severe repeated asthma attacks. (Tr. 41, 46, 607-608.)

19

stressors associated with obtaining and sustaining full time employment would "result in deterioration of [her] condition." (Tr. 673.[19]) He indicated she had marked difficulties in performing ADLs and in maintaining social functioning; frequent deficiencies in concentration, persistence or pace; and repeated episodes of deterioration or decompensation in work or work-like settings.[20] (Tr. 677.) With regard to ADLs, Dr. Norton noted that although she was well-groomed and kept her children properly clothed and clean, she did only "the basics" at home and procrastinated about

---

[19]   Plaintiff also cites to Tr. 800-809, employability assessment forms prepared by Drs. Norton and Lekhwani in support of her application for assistance from the Pennsylvania Department of Welfare.  (Plf.'s Brief at 6-7.)  These documents were not part of the record reviewed by the ALJ at or subsequent to the September 1, 2004 hearing.  Rather, they were submitted by Ms. Litz to the Appeals Council at the time of its review.  (See Tr. 797, December 15, 2004, cover letter from Plaintiff's counsel.)  The Appeals Council based its review on the entire record, including the late-provided evidence, but concluded it did "not provide a basis for changing the [ALJ's] decision."  (Tr. 6-7; see also Matthews v. Apfel, 239 F.3d 589, 592 and n2 (3d Cir. 2001), citing 20 C.F.R. §§ 404.970(b) and 416.1470(b).)  Plaintiff may not rely on that evidence in her appeal to this Court unless she can show (1) the evidence is "new and material," (2) it relates to the period on or before the date of the ALJ's decision, and (3) there was "good cause for not having incorporated the new evidence into the administrative record."  Matthews, id. at 592-593, quoting Szubak v. Sec'y of HHS, 745 F.2d 831, 833 (3d Cir. 1984).  Inasmuch as Plaintiff offers no such arguments in her brief, the Court will not consider the evidence at Tr. 800-809.

[20]   Defendant points out Drs. Norton and Lekhwani both opined that Ms. Litz had experienced "repeated episodes of decompensation, each of extended duration," arguing that this conclusion reflects their lack of familiarity with the regulatory standard.  Thus, she argues, because Plaintiff fails to provide evidence showing her psychiatrists properly applied the regulatory definition of this phrase, their conclusions are unsupported by the record as a whole. (Def.'s Brief at 12.)  Assuming this argument is correct, such an analysis should have been made by the ALJ as part of his decision, not a post-hoc rationalization in the Commissioner's summary judgment brief.

20

completing household chores. She was able to interact with persons in authority at a fair to good level, but Plaintiff's other social functions and skills, e.g., ability to get along with others, initiate social contacts, participate in group activities, and interact with co-workers or the public were described as fair or poor. Her ability to concentrate and persist at tasks was also described as fair to poor, as was her ability to adapt to stressful circumstances in work-like situations. (Tr. 678-682.)

In his notes from a medication check on May 13, 2002, Dr. Norton noted that Ms. Litz reported she was "doing okay" while "dealing with a lot of stress." (Tr. 607.) She was sleeping well because she was "usually exhausted," and had been using Xanax (which had been prescribed for use as needed, up to one per day) "somewhat more frequently in recent weeks." (Id.) Her mental status was in all regards normal and/or positive, e.g., she was alert, with coherent and relevant speech, well-organized thought processes, spontaneous and appropriate affect. Dr. Norton concluded that she "appears to be coping well with significant life stressors and maintaining good stability in her mood." He continued her currently prescribed medication, i.e., Luvox, 100 mg. twice a day and Trazondone 50 mg. at bedtime, but increased her use of Xanax, 0.25 mg. as needed up to twice a day.[21]  (Id.)

---

[21]  Luvox (fluvoxamine) is used to treat obsessive-compulsive disorder and depression. Trazodone is used to treat depression and/or anxiety. Xanax (alprazolam) is used to treat anxiety disorders and panic attacks. See www.nlm.nih.gov/medlineplus/druginfo. At the time

At the next medication checkup on August 23, 2003, Ms. Litz
reported she had been feeling more pressured, "a little more
depressed," and "more sorry for herself," mostly related to demands
of her children, but stated that "she finally seems to be getting
better and feeling better." (Tr. 606.)  Ms. Litz continued to see
a therapist "usually every two weeks."  Although her mental status
was essentially unchanged from the previous interview and she was
able to maintain "a show of optimism," her mood was characterized
by "fluctuating feelings of depression and discouragement."   She
was patient with her children who accompanied her to the clinic and
showed no unusual agitation or irritability with them.  Despite a
"very high level of environmental stress," Ms. Litz appeared to be
"coping effectively."  (Id.)

    Dr. Norton reviewed Ms. Litz's medications on two more
occasions, each time noting that she was "doing pretty much okay,"
and "coping effectively" with "life stressors." (Tr. 605, 671.)  He
noted on June 16, 2003, that she was

    dealing with considerable ongoing stressors in her
    responsibilities for her two children, both of whom have
    significant special needs.    She  is  dealing  with
    overwhelming demands with limited resources.  Her stress
    level certainly does not appear to [be] inappropriate
    under the circumstances.  She appears to be maintaining
    fairly good stability in her coping mechanisms overall.

of the hearing, Ms. Litz testified that she was taking vitamin B12
shots monthly, daily vitamin B pills and neurontin three times a day
for her polyneuropathy, klonopin, and maxalt for migraine headaches.
(Tr. 48-54, 59.)  Klonopin (a benzodiazepine) is prescribed for
numerous nervous system conditions including anxiety, panic disorders,
and insomnia.  See www.nlm.nih.gov/medlineplus/druginfo.

22

(Tr. 671.)

On August 12, 2003, Ms. Litz transferred from Community Health to Family Psychological Associates, where she began treating with Dr. Lekhwani whose initial diagnosis was major depressive disorder, recurrent, and anxiety disorder, NOS. (Tr. 751-753.) Like Dr. Norton, Dr. Lekhwani saw Ms. Litz periodically for medication checks while she had weekly or bi-weekly sessions with a therapist. During the period August 2003 to August 2004, she repeatedly stated she was doing well with her medications[22] but was under constant stress due largely to her son's behavioral problems. When she failed to take her medications or experienced increased social stresses (e.g., family or financial problems and her own ear surgery), she reported increased anxiety and depression along with sleep disturbances. Dr. Lekhwani noted Ms. Litz was generally well-kempt and cooperative, with good eye contact, normal motor and speech patterns, goal-directed thought processes, and normal

---

[22]   The Court notes in passing that standing alone, the fact that Plaintiff's symptoms were alleviated when she took her medication as prescribed is insufficient to support a conclusion she could perform substantial gainful activity. In Morales, a treating psychiatrist noted that although the claimant's affective and anxiety disorders were "stable and well controlled with medication," he also indicated that Morales's impairment rendered him markedly limited in a number of relevant work-related activities. Morales, 225 F.3d at 315, 317. The ALJ focused on the first point without considering the second. The Court of Appeals held that the doctor's opinion that Morales's ability to function "in every area related to work" was seriously impaired or non-existent should not be "supplanted by an inference gleaned from treatment records reporting on the claimant in an environment absent of the stresses that accompany the work setting." Id. at 319.

23

perceptions and orientation as to time, space and person. However, he generally described her affect as sad or anxious. As of May 2004, Dr. Lekhwani began describing her depression as being "in partial remission." (Tr. 771.)

On August 25, 2004, Dr. Lekhwani completed a questionnaire similar to that prepared by Dr. Norton in February 2002 in which he indicated full time employment would be "improbable and too difficult" for Ms. Litz at that time due to excessive anxiety, frequent panic attacks, depression, sleep disturbances, decreased energy, feelings of worthlessness and guilt, and difficulty with concentration, thinking, and social functioning. (Tr. 759.) One impairment identified by Dr. Lekhwani which was not mentioned by Dr. Norton was severe panic attacks which Ms. Litz experienced three to four times a week. (Tr. 757.) His opinion, like that of Dr. Norton, was that she experienced marked difficulties in activities of daily living and social functioning, frequent problems in concentration, persistence and pace, and repeated episodes of decompensation of an extended duration. (Tr. 764.)

Plaintiff contends that under the treating physician doctrine, a court considering a claim for SSI or DIB "must give greater weight to the findings of a treating physician than to the findings of a physician who has examined the [c]laimant only once or not at all." (Plf.'s Brief at 10, *citing* Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993).)  Ms. Litz argues that the ALJ "was required

24

to give controlling weight to both Dr. Lekhwani's and Dr. Norton's opinions" and erred by failing to do so.  (Id. at 12.)

Although the ALJ referred to Dr. Norton's medication check notes for the period May 2002 through June 16, 2003 (Tr. 17), he failed to explain the weight, if any, he gave to medical opinions therein.   Moreover, while the ALJ acknowledged Dr. Lekhwani's comment in his questionnaire that Ms. Litz "was thought to have frequent deficiencies of concentration and marked limitations in social functioning and activities of daily living," he gave that "extremely restrictive medical assessment" "extremely little weight," concluding Dr. Lekhwani's opinions were "not supported by any treatment notes and appear to be based solely on claimant's subjective complaints."[23]  He also concluded that Ms. Litz sought Dr. Lekhwani's treatment on July 30, 2003, "apparently for secondary gain."  (Tr. 17, 19, *citing* Tr. 759, Exhibit B-23-F at

---

[23]  Plaintiff contends that the ALJ erred by arriving at this conclusion.   (Plf.'s Brief at 9, *citing* Tr. 19.)  To the contrary, she argues, Dr. Lekhwani's medication check notes were part of the record when the ALJ prepared his decision, along with treatment notes for the period August 2003 through September 2004 which were provided, with permission, after the hearing.   The Court finds the comment that Dr. Lehkwani's opinions "are not supported by any treatment notes" to be somewhat ambiguous.   That is, while it can be read as Plaintiff suggests, meaning the ALJ erred in making this statement since Dr. Lehkwani's notes were clearly part of the record, it can also be read to mean that the ALJ found the psychiatrist's highly restrictive conclusions in the questionnaire and psychiatric activities assessment were inconsistent with (i.e., "not supported by") his medication notes.   On remand, it will be helpful if the ALJ clarifies this point as well.

25

6.[24])   On the other hand, the ALJ notes that he "accords great weight" to the opinions of the non-examining psychologists who reviewed Ms. Litz's medical records in October 2002 and June 2003. (Tr. 19, *citing* Exhibits B-12-F and B-13-F.)

The first of the two state- agency psychologists, Dr. Edward Jonas, prepared a psychiatric review technique form on October 25, 2002.   (Tr. 577-590.)   In the form, he noted, without further explanation, that Ms. Litz had been diagnosed with major depression, which he described as "in partial remission now."   (Tr. 580.)   He concluded there were no limitations in activities of daily living or in maintaining concentration, persistence and pace, only mild difficulties in social functioning, and no episodes of decompensation of extended duration.   (Tr. 587.)   He based these conclusions, apparently, on notes from two meetings between

_____

[24]   The Court cannot determine the source of this conclusion. Nothing on the page of the transcript cited by the ALJ refers to Plaintiff's reasons for seeking Dr. Lekhwani's assessment.   Ms. Litz testified that she changed psychiatrists in August 2003 because Community Health "was threatening to close down" and she did not think the therapist with whom she was working there was helping her "cope." (Tr. 63.)   We have been unable to identify any evidence to contradict this statement nor to support the ALJ's conclusion that she sought Dr. Lekhwani's assessment "apparently for secondary gain."   There is a note in Dr. Norton's records which indicates Plaintiff's son lost access to his doctor and therapist at Community Health in June 2003 and was no longer receiving "TSS services," which Dr. Norton characterized as "a loss of support for Dawn."   (Tr. 606.)   Assuming "TSS services" refers to therapeutic staff support services which the Pennsylvania Department of Public Welfare provides to children with developmental and behavioral deficits such as Plaintiff's son, it is unclear how changing her own psychiatrist would affect whether or not the child received such services.

26

Plaintiff and Dr. Norton which had occurred on May 13 and August 23, 2002, in which Dr. Norton noted Ms. Litz had demonstrated appropriate dress and appearance, relevant and coherent speech, well-organized thoughts, good focus, fluctuating depression, pleasant affect, good stability in her mood, and was able to reside independently. Dr. Jonas also commented that Dr. Norton's notes of the August 23, 2002, meeting indicated Ms. Litz had been patient with her children. (Tr. 589.)

The second report by a reviewing psychologist is somewhat ambiguous. It also appears to have been completed by Dr. Jonas, but dated November 18, 2002, and countersigned by Dr. Roger Glover on June 18, 2003. (Tr. 591-604.) The person completing the form noted major depression, now in partial remission, no limitations in activities of daily living, and no episodes of decompensation of extended duration, with - at most -- mild limitations in social functioning and in the ability to maintain concentration, persistence and pace. (Tr. 594, 601.) These conclusions were based, again apparently, on the August 23, 2002, notes of Dr. Norton, along with a report by a neurologist, Dr. Munir Elawar, who examined Ms. Litz on June 13 and October 23, 2002, in connection with her complaints of numbness in her hands and feet. (*See* Tr. 570-576.) The state agency psychologist particularly noted that Dr. Elawar found her attention, language, memory and fund of

knowledge were within normal limits.[25]   The writer of the second evaluation also referred to Plaintiff's self-reported activities of daily living, e.g., the fact that she cooked at the end of the day, did light cleaning, and reported physical limitations, along the fact that she has been "fired from most jobs [approximately] 20, and was "devastated" by disagreements.   (Tr. 603.)   He accorded "great weight" to the notes of the treating source, Dr. Norton, and "some weight" to Dr. Elawar's comments.   (Tr. 603.)

Social Security regulations carefully set out the manner in which medical opinions are to be evaluated.   20 C.F.R. § 416.927. In general, every medical opinion received is considered.   Unless a treating physician's opinion is given "controlling weight," the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the treatment relationship (more weight given to opinions of treating sources); (3) the length of the treatment relationship and the frequency of examination (more weight given to the opinion of a treating source who has treated the claimant for a long time on a frequent basis); and (4) the nature and extent of the treatment relationship (more weight given to the opinions of specialist than to generalist treating sources.)

---

[25]   The writer of this evaluation, the ALJ and Defendant all fail to note Ms. Litz's report to Dr. Elawar that she experienced headaches for 20 years, depression for 17 years, chronic fatigue, declining memory, occasional diplopia (double-vision), and his comment that her mental status was "remarkable for giggling frequently."   (Tr. 572-573.)

28

20 C.F.R. § 416.927; *see also* Fargnoli, 247 F.3d at 43, and Sykes, 228 F.3d at 266 n7. The opinions of a treating source are given controlling weight on questions of the nature and severity of the claimant's impairment(s) when the conclusions are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 416.927(c).

The fact that the ALJ gave the reports of Drs. Jonas and Glover greater weight than that of Dr. Lekhwani is troubling for numerous reasons. First, we find the facts of this case similar to those of Cadillac v. Barnhart, No. 03-2137, 2003 U.S. App. LEXIS 24888 (3d Cir. Dec. 10, 2003), in which the claimant was diagnosed with chronic hepatitis C and lumbar radiculopathy. Two state agency physicians reviewed his medical records in 1996, each concluding that Cadillac was capable of engaging in light activity. Id. at *4-*5. After those assessments were completed, Cadillac's back condition was evaluated on three separate occasions in the next year by orthopedic surgeons. In her opinion denying disability insurance benefits, handed down in February 1998, the ALJ gave controlling weight to the state agency physicians' reports and "minimal" weight to the orthopaedists' opinions. Id. at *8-*9. On appeal from the district court's opinion affirming the ALJ's decision, the Court of Appeals noted that the fact Cadillac was hospitalized after the state agency physicians had completed their

29

assessments meant they never had an opportunity to consider the significant medical events which occurred in 1997.  The Court held it was error for the ALJ to have favored the state agency examiners' conclusions based on an incomplete record over the physicians' opinions based on later, more complete medical records, as well as a hands-on examination.  Id. at *15-*16.  See also Morales, 225 F.3d at 320, remanding in part because the ALJ erroneously relied upon state agency reports which were prepared only from a review of the record and without treating physician assessments, all of which directly undermined the conclusions drawn by the state agency doctors, and Hippensteel v. SSA, 302 F. Supp.2d 382, 393-394 (M.D. Pa. 2001), noting that where a non-examining source based his conclusions on an incomplete record, "vague references to the record as a supporting explanation for his opinion cannot be given great weight."

Similarly, the non-examining state agency physicians in this case completed their reviews not later than June 2003.  That means neither of them could have considered treatment notes from Dr. Norton or Dr. Lekhwani for the period June 2003 through September 2004.  Therefore, they could not have had a full understanding of Ms. Litz's mental condition when they reached their conclusions more than a year before the ALJ made his decision to deny benefits.

Second, as Defendant points out, the Third Circuit has held that a form report where a physician simply checks a box or fills

in a blank is, at best, "weak evidence" and where such a report is not accompanied by a thoroughly written analysis, its reliability is "suspect." (Def.'s Brief at 16, n6, *citing* Mason, 994 F.2d at 1065.) While Defendant argues that this applies to the psychiatric activities assessments and questionnaires prepared by Drs. Norton and Lekhwani, such a standard must also be applied even more stringently to the psychiatric technique review forms of Drs. Jonas and Glover. It is well-established that the weight given to the opinion of a non-examining source will depend on explanations provided or satisfactory contradictory evidence supporting such opinion. Hippensteel, 302 F. Supp.2d at 393, *citing* 20 C.F.R. § 416.927 and Morales, 225 F.3d at 317.

The forms completed by the state agency psychologists contain no written analysis supporting their conclusions that Plaintiff's depression and anxiety impose no more than moderate limitations in concentration, social functioning, and activities of daily living. *See* Franklin v. Barnhart, CA No. 05-2215, 2006 U.S. Dist. LEXIS 39678, *29-*32 (E.D. Pa. June 13, 2006), concluding in a similar case that the ALJ had erred where the only evidence contradicting the treating psychologist's conclusions regarding the effects of plaintiff's depression on her daily life was a form report from the non-examining state psychologist which provided no details of the reasoning for his finding. Dr. Lekhwani's psychiatric activities assessment and questionnaire, on the other hand, include written

comments in response to almost every question asked. Although Social Security regulations note that administrative law judges "must consider" the opinions of state agency physicians inasmuch as those individuals are experts in their fields and trained in applying the regulations (20 C.F.R. § 404.1527), we find no reason to give greater weight to boxes checked by a state psychologist than to those checked by a treating physician, particularly where the latter provides reasons for his check marks and the state agency physician does not.

Defendant also argues that the opinions expressed in Dr. Lekhwani's questionnaire as to Ms. Litz's ability to obtain and sustain full-time employment are entitled to no "special significance" inasmuch as the decision about whether a claimant is disabled is an issue reserved to the Commissioner of Social Security. (Def.'s Brief at 17, *citing* 20 C.F.R. §§ 404.1527(e)(2)-(3) and 416.927(e)(2)-(3).)

Again, the Court has been unable to find any analysis of this point in the ALJ's opinion itself. The ALJ made brief reference to Dr. Lekhwani's questionnaire, noting that Ms. Litz attended outpatient therapy sessions on a weekly basis, the diagnoses of depression and anxiety disorder were unchanged from August 2003,[26]

---

[26] Actually, Dr. Lekhwani refers in the psychiatric activities assessment to panic attacks which occurred 3 to 4 times a week (Tr. 757), a diagnosis which did not appear in his initial evaluation in August 2003. In fact, at that time, she denied any such attacks. (Tr. 751.)

and that "claimant was thought to have frequent deficiencies of
concentration and marked limitations in social functioning and
activities of daily living." (Tr. 17.) While it is true that
opinions (even by treating sources) that an individual is disabled
and unable to work are not entitled to controlling weight or
special significance, it does not mean that such opinions are to be
rejected in their entirety. *See* "Medical Source Opinions on Issues
Reserved to the Commissioner," Social Security Ruling ("SSR") 96-
5p,[27] stating: "[O]ur rules provide that adjudicators must always
carefully consider medical source opinions about any issue,
including opinions about issues that are reserved to the
Commissioner. . . . [O]pinions from any medical source on issues
reserved to the Commissioner must never be ignored." Here, nothing
in the ALJ's decision indicates that he "carefully considered" Dr.
Lekhwani's opinion that "regular participation in meaningful daily
employment [would be] improbable and too difficult for [her]
currently." (Tr. 760.)

Finally, the Court finds troubling the fact that the ALJ
relied extensively on the fact that Ms. Litz was capable of caring
well for her children, equating this apparently with skills and

---

[27] "Social Security Rulings are agency rulings published 'under
the authority of the Commissioner of Social Security' and 'are binding
on all components of the Social Security Administration.'" Sykes, 228
F.3d at 271, *citing* 20 C.F.R. § 402.35(b)(1). "Rulings do not have
the force and effect of the law or regulations but are to be relied
upon as precedents in determining other cases where the facts are
basically the same." Sykes, id., *quoting* Heckler v. Edwards, 465 U.S.
870, 873 n3 (1984).

33

abilities which are transferrable to the workplace. He noted that she walks her son to and from school every day, that she is "the primary caregiver for her two young children," a responsibility he describes as "a full time job," and that her conditions "did not impact [her] ability to care for herself or her two children." (Tr. 18.) He further commented that her "symptomatology was attributable to the demands of caring for her two young children," but she was "coping effectively and dealing with the demands of being a single parent, transportation difficulties, and her son's behavior problems." (Tr. 17.)

As the Seventh Circuit Court of Appeals has pointed out, the fact that a parent takes adequate care of her children may be the result of "heroic efforts" and that providing such care has "a degree of flexibility that work in the workplace does not." Gentle v. Barnhart, 430 F.3d 865, 867-868 (7ᵗʰ Cir. 2005) (Posner, J.) As the Social Security Administration has noted,

> Good mental health services and care may enable chronic patients to function adequately in the community by lowering psychological pressures, by medication, and by support from services such as outpatient facilities, day care programs, social work programs and similar assistance. . . . The mentally impaired may cease to function effectively when facing such demands as getting to work regularly, having their performance supervised, and remaining in the workplace for a full day.

SSR 85-15: "Titles II and XVI: Capability to do Other Work — The Medical-Vocational Rules as a Framework for Evaluating Solely Nonexertional Impairments;" see also Allen v. Barnhart, 417 F.3d 396, 403-407 (3d Cir. 2005), discussing this ruling.

The fact that Ms. Litz was able to care for herself and her

34

children in a competent manner does not necessarily mean that she is capable of performing work-activities outside the home. *See* Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006), noting that "the pressures, the nature of the work, flexibility in the use of time, and other aspects of the working environment as well, often differ dramatically between home and office or factory or other place of paid work;" and Smolen v. Chater, 80 F.3d 1273, 1284, n7 (9th Cir. 1996) "many home activities may not be easily transferable to a work environment where it might be impossible to rest periodically or take medication." While the ALJ was certainly correct in considering Plaintiff's activities of daily living, the repeated emphasis on the fact that she was "coping effectively" with two small children may reflect an improper inference that Ms. Litz was therefore able to work, as the regulations require, on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule. *See* SSR 96-9, defining residual functional capacity.

In sum, we agree with Plaintiff that the ALJ erred by failing to adequately explain why he gave less weight to the opinions of her treating physicians, particularly that of Dr. Lekhwani, than to the opinions of non-examining state agency physicians who reviewed an incomplete medical record more than a year before the ALJ handed down his decision and failed to explain their conclusions that she was not disabled. Moreover, by failing to discuss systematically

the B criteria (or even acknowledge the C criteria) of Listings 12.04 and 12.06 and Dr. Lekhwani's opinion on those matters, the ALJ may have erred in concluding that Ms. Litz did not meet either Listing.  *See* Smith v. Barnhart, No. 02-1675, 2002 U.S. App. LEXIS 25441, *8 (3d Cir. Dec. 9, 2002), rejecting the ALJ's "mere conclusory statement" that the claimant did not meet the listings, and requiring him to articulate how he came to his decision in step three, adequately identify the evidence he relied on in reaching that decision, identify the specific listing or listings he considered, and discuss medical equivalence or identify which elements were missing from which criteria of the listing.

"Where there is conflicting probative evidence in the record, we recognize a particularly acute need for an explanation of the reasoning behind the ALJ's conclusions, and will vacate or remand a case where such an explanation is not provided." Fargnoli, 247 F.3d at 42.  While the ALJ is not required to identify or refer to every item in the record, "he must give some indication of the evidence that he rejects and his reason(s) for discounting that evidence." Id. at 42-43 ; *see also* Landeta v. Comm'r of Soc. Sec., No. 05-3506, 2006 U.S. App. LEXIS 20905, *14 (3d Cir. Aug. 14, 2006) (case law requires that the ALJ state the evidence considered which supports the result reached and indicate any evidence which was rejected.)  As the Court of Appeals has pointed out, absent such an explanation, the court is "handicapped" because it is

36

"impossible to determine whether the ALJ's finding . . . is supported by substantial evidence." Fargnoli, 247 F.3d at 40; see also Stewart v. Secretary of HEW, 714 F.2d 287, 290 (3d Cir. 1983) (in the absence of such an explanation, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.)

In light of the remand for further analysis of these two inter-related issues, we do not address in depth Plaintiff's final argument that the ALJ improperly disregarded the VE's testimony and relied on an incomplete hypothetical question, i.e., one which did not include the limitations imposed on her ability to work as a result of panic attacks[28] which would cause to her miss work one day each week. (Plf.'s Brief at 16-17, citing Tr. 67.)  Should the ALJ determine on remand that Ms. Litz satisfies the B criteria for Listing 12.04 and/or 12.06, his analysis will be complete at step three and there will be no need for a vocational expert to consider hypothetical questions.  On the other hand, if the ALJ determines

_____

[28]  Plaintiff also argues that when the additional limitation of once-weekly migraine headaches of such severity that the individual would be off-task for up to an hour at a time was incorporated into the hypothetical question, the VE opined that such an individual would be precluded from sustained employability.  (Plf.'s Brief at 17, citing Tr. 67.)  Plaintiff does not argue elsewhere in her brief that the ALJ erred by failing to recognize her migraine headaches as a severe impairment, nor does she point to evidence in the record which would support such a finding.  If the headaches were not "severe," as that term is defined in the regulations, the ALJ was not required to incorporate the restriction into his hypothetical question.  See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987), holding that a proper hypothetical question is one which reflects "all of a claimant's impairments that are supported by the record."

that she does not satisfy either Listing, any question posed to a
vocational expert at another hearing will, we assume, reflect all
the impairments which are supported by the record.    Ramirez v.
Barnhart, 372 F.3d 546, 552-553 (3d Cir. 2004).

## V.    FURTHER PROCEEDINGS

Under 42 U.S.C. § 405(g), a district court may, at its
discretion, affirm, modify or reverse the Secretary's final
decision with or without remand for additional hearings. However,
the reviewing court may award benefits "only when the
administrative record of the case has been fully developed and when
substantial evidence on the record as a whole indicates that the
plaintiff is disabled and entitled to benefits."    Krizon v.
Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa. 2002), quoting
Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir. 1984).

While we agree that if Dr. Lekhwani's opinion that Ms. Litz
met at least two of the four B criteria of Listing 12.04 and/or
12.06 is accepted, she would be entitled to benefits at step three
of the required analysis, the decision to accept his finding
requires weighing his opinion against that of Drs. Jonas and
Glover, along with the other evidence of record.    Resolving
conflicts in the evidence is the task of the ALJ, not this Court.
Kent, 710 F.2d at 114.  Because the ALJ fails to fully explain his
reasoning with regard to step three, particularly the preference
given to the state agency evaluations over the opinion of Drs.

38

Norton and Lekhwani in arriving at his conclusions, we find remand is the proper action so the ALJ may clarify his analysis.   An appropriate order follows.

October ⟋9⟍ , 2006

_William L. Standish_
William L. Standish
United States District Judge

cc:   Christine M. Nebel
      220 South Washington Street
      Butler, PA 16001
      Email: cnebel220@aol.com

      Paul Kovac
      United States Attorney's Office
      700 Grant Street
      Suite 4000
      Pittsburgh, PA 15219
      Email: paul.kovac@usdoj.gov